**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DAVID L. BRUCE,**

      **Petitioner,**               **CASE NO. 2:10-CV-889**
                                     **JUDGE MICHAEL H. WATSON**
      **v.**                      **Magistrate Judge Abel**

**WARDEN, Lebanon Correctional**
      **Institution,**

      **Respondent**

**REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, Respondent's *Return of Writ,* Petitioner's *Traverse*, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the petition for a writ of habeas corpus be **DISMISSED**.

**FACTS and PROCEDURAL HISTORY**

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of this case as follows:

> When Troy Boyes arrived for work at 4640 Bridgeport Street, Lot # 13, Baltimore, Ohio, on January 27, 2005, he discovered a partially clothed African-American female with multiple stab wounds and remnants of bindings on her body, deceased on the front porch of the home that was under construction. Mr. Boyes noticed blood on the windows in the formal eating room, the floor, the front door, the stairs and the tile kitchen. The blood, the body, and the trash were not on the front porch the evening before when Mr. Boyes left that home which he was helping to build.
>
> Troy Boyes tried calling the president of his company, Phil DiYanni. When Mr. DiYanni was reached, he immediately called 9-1-1. Mr. DiYanni drove to the house and saw the bloodstains up and down the stairwell, around the front door and the body on the front porch.

The numerous puncture or stab wounds were obvious and the victim was lifeless according to Fairfield County Deputy Betsy Willey's observations when she arrived at the scene. Deputy Gerald Seipel described the victim as a female, partially clothed from the waist up lying on the porch with her feet over the edge, with obvious stab or puncture marks in several places. Firefighter/Paramedic Ray Friesner of the Basil Joint Fire District verified that the female was deceased. Mr. Friesner observed that the deceased victim on the porch was a partially clothed black female with some sort of bandanna around her neck and wrists. The bandanna appeared to have been tied around her neck, the clothes she had on were bloody, and there were some bindings on both of her wrists and her right ankle.

The coroner, Dr. Patrick Fardal testified that the victim, identified as Robin Brown, had at least fifteen (15) sharp instrument wounds. Some of the wounds were connected meaning they went all the way through her body. This made it impossible to know the exact number of times she had been stabbed. On the lateral side of her right thigh, there was a sharp instrument wound about one and a half inches long. There was a sharp instrument wound on the inside of her right thigh that was also one and a half inches long. The doctor concluded that these two wounds were connected and counted them as one because it was most likely that the sharp instrument went in one side and came out the other with a connector of about two and three-quarter inches. There was another sharp instrument wound approximately two and a half inches long on the outside of her body that connected up to a one and one half inch sharp instrument wound on her anterior right thigh, with the connected path of nearly five and one half inches. This sharp instrument went through a considerable portion of her right thigh. Therefore, while there were four injuries on her right thigh the doctor counted two sharp instrument wounds on the right thigh, meaning that she was stabbed in the right thigh at least twice.

The victim also had at least five stab wounds on her right hand. On the back of her right hand, there was a one and a half inch sharp instrument wound with secondary tearing toward the front of the body at the top. There was another sharp instrument wound between her thumb and right finger that was approximately three-eighths of one inch long, connected to the wound on the back of the hand. Additionally, a three-eighths of one-inch defect on the knuckle of the thumb that was also connected to the back of the hand was discovered. This wound looked like the sharp instrument came in the backside of her hand, went towards her thumb, and exited in two places-inside the web between her fingers and the back part of her

thumb on her knuckle.

Separate wounds identified as two, three, four, and five on the back of her right hand were caused by a sharp instrument. These wounds measured three quarters of one inch, three quarters of one inch, one inch, and one quarter of one inch respectfully. The wounds on the back of her knuckles could have been one slice that caused all of the wounds on each of her fingers. Accordingly, the total number of cuts on her right hand ranged from two to five.

The victim's right breast also had multiple stab wounds. There was a series of approximately three wounds in the upper outer quadrant of her right breast towards her axilla that measured one and one quarter inch, one and one half inch, and one inch. Due to the close proximity of the separate wounds, the doctor could not determine which of the three was fatal, but could conclude within a reasonable degree of medical certainty that one of the three wounds were fatal. One of the three wounds in the right side of her breast went into her right chest and caused an injury to her right lung and then extended through her pericardial sac and caused an injury to the area of the right heart. Another separate sharp instrument wound in her right breast measured one and three-quarter inches long and extended upward towards her axilla, or armpit, which was in the opposite direction of the other three. The wound that was responsible for penetrating her heart went through her chest and into the chest wall extending six inches into her body. Another sharp instrument wound in her right breast extended anteriorly in toward her midline and was one and three-quarters inches long and six inches deep injuring the lower lobe of her right lung, the pulmonic veins, and created a defect in the sac around her heart. In addition to the fatal wounds, a superficial abrasion extended from her right nipple that was one and a half inches by one half inch wide. Accordingly, at least seven sharp instrument wounds occurred on the victim's right breast.

Between the victim's breasts on her right chest was another sharp instrument wound measuring two and a half inches by one-sixteenth of an inch in width and three and a half inches deep that extended posteriorly, towards her back, but went into the fat of her abdomen. The victim's back had a sharp instrument wound on the left side measuring one and three-quarters inches long that extended three inches into her pleural cavity on the left side and injured her left lung. The wound entered through her back and injured both the upper and lower lobes of the left lung. The victim's neck had two abrasions that could be from the sharp instrument being dragged along the skin, or

3

could have been from another source such as clothing. One measured four and a half inches in length and the other one measured about three-quarters of an inch in length.

In addition to the injuries caused by the sharp instrument, the victim had injuries on her face. There was a pattern abrasion on her face below the left eye that was a three-quarter-by-three-quarter inch diameter pattern abrasion. An object striking her head or her head striking an object could have caused the injury. Finally, there were some superficial abrasions on her left wrist.

The cause of Robin Brown's death was multiple sharp instrument wounds with injuries to the right heart, right lung, pulmonic veins, and the left lung.

The bindings around Robin's wrists and ankles as well as her clothes were sent from the coroner's office to BCI & I through the Sheriff's Office. The denim from the victim's right wrist was stained with blood. The t-shirt was so heavily stained with blood that there were not any isolated stains on the shirt.

Detectives from the Fairfield County Sheriff's Office and the specialists from BCI & I collected evidence from the scene, 4640 Bridgeport Street, Lot # 13 Baltimore Ohio. Detective Stephanie Russell located a cigarette butt on the floor of the garage between tire tracks and the door. Detective Scott Jones removed drywall from the west side of the wall in the bedroom. This drywall was covered in what was later determined to be blood. The bloody stain also contained a fingerprint. A single edged knife blade, butcher style, stamped stainless steel marked "Made in China" was recovered from the scene. There was dried blood on the blade and no handle for the knife. A piece of black plastic that could have been a portion of the handle was also recovered. A pair of glasses missing the left lens was located in a small bedroom. The t-shirt Robin Brown was wearing was observed by officers at the scene and then removed at the time of the autopsy at the Franklin County Morgue. In addition, photos were taken showing the victim with the bindings and the blood around her at the scene. Detectives never found pants, a skirt, a purse, a wallet or any money.

Following a match by BCI & I of appellant's prints found in the victim's blood on the drywall and the scene, the appellant made two taped statements to detectives. Following a waiver of his *Miranda* rights, appellant stated that he worked for Buckholz Wall Systems,

a stucco company. His supervisor is Anthony Smith. When confronted with the evidence that his fingerprint was in one of the houses in the victim's blood, appellant explained that he would go in houses all the time, especially in the winter to warm up. While the appellant stated that he did not remember the last time he was working on houses in the Woodside area, he knew it was in January and said he believed he left town the night of January 21, 2005. Appellant also stated that the night that he left town, his car broke down and he was picked up by a courtesy van that should have his information in the driver's records.

Appellant further stated that his brother lives near Champion Avenue in Columbus, Ohio. While appellant was not certain, he stated it was possible that he and his brother picked up Robin in appellant's car. However, after seeing her picture he stated that he did not know the victim. Appellant did not have any explanation as to how his fingerprint could have ended up in the victim's blood inside of the house.

Testimony was presented at trial that employees who worked outside were not permitted inside of the homes. The crew leader, Steven Smith, testified that in order to enter a house, a crewmember would need to ask his permission and appellant never asked his permission to enter the house. Similarly, Christopher Curtis testified that he was on the same crew as appellant and was never in the house, but was in the garage. The Office Manager for Buckholz Wall Systems testified that appellant was one of their employees from April 21, 2004 through January 21, 2005, and that appellant would not be allowed in the house as the company only works on the outside of the houses, not the inside.

Records from the courtesy van company from West Virginia were inconsistent with the appellant's statement. The records established that appellant did not leave town on January 21, 2005 as he stated to the police. The records show that he left town the night Robin Brown was killed. The courtesy van driver, John L. Aylor, testified that he received a call on January 27, 2005 at 7:23 a.m. regarding a broken Explorer with the license plate DBY 5680. Mr. Aylor took the driver to the Go-Mart in Elkins, West Virginia. Appellant's co-worker Charles Okpara identified appellant's car as the same one photographed by law enforcement.

Appellant's car was towed in West Virginia on February 19, 2005, when a private citizen called to report the vehicle on the roadway.

The vehicle was a 1997 Ford Explorer with a license plate number of DBY 5680. The back window was already broken out when Jeffrey Fletcher of the West Virginia State Police first saw the vehicle. The State and Defense stipulated that if called to testify, Jimmy Tincher would testify that he is the owner of Tincher's Towing in Elkins, West Virginia and that he has a wooden fence surrounding the lot. He towed a white Ford Explorer license plate DBY 5680 to his lot and noticed that the back window had been broken out. He went through the car in order to locate some papers with a phone number and address in an attempt to reach the owner. On March 7, 2005, he towed the vehicle to the Sheriff's lot and saw law enforcement put crime scene tape around the vehicle. Investigators came some time between February 19, 2005, and March 7, 2005, to look at the vehicle, but they did not put in, or take out, anything. To the best of his knowledge, no one else entered or tampered with the vehicle.

Detective Mark Green of the Columbus Police Department processed the white Ford Explorer, DBY 5680, on March 18, 2005. He found a piece of denim on the driver's side rear floorboard with discoloration that appeared to be blood. The vehicle also contained work gloves, two knives, and tape.

On January 26, 2005, Angelo Brown, the victim's husband, drove Robin Brown to Champion where Sherwood Brown lives. Robin was wearing a black coat, jeans and tennis shoes when he dropped her off. Jacqueline Meadows saw Robin Brown at 485 North Champion Avenue the night Robin was murdered. Jacqueline had often seen Robin there visiting her nieces and Robin appeared to be visiting her nieces that night. Jacqueline last saw Robin between 9:00 and 10:30 p.m. that night when Robin was leaving in a white SUV that looked like appellant's vehicle. When Jacqueline last saw Robin, Robin did not appear to be under the influence of drugs or alcohol and was wearing a jacket, a dark-colored shirt, and jeans.

Robin's husband testified that she was wearing a black coat, jeans, and tennis shoes with a shirt. The jacket, jeans, and tennis shoes were never recovered.

The evidence that had been stained with blood was tested by BCI & I to confirm that it was actually blood and to determine the source of the blood. Abby Schwaderer of BCI & I did the presumptive testing and was stipulated as an expert in presumptive testing by the State and Defense. Ms. Schwaderer testified that BCI & I is accredited by the American Society of Crime Laboratory Directors/Laboratory

Accreditation Board, ASCLD/LAB for forensic DNA and DNA laboratories. The accreditation includes both training and audits to make sure the lab is upholding all of the requirements and standards to properly determine the source of DNA if present on the items tested. Her report listed all of the items tested with presumptive blood, including but not limited to the knife blade, the door handle, the sock, shirt, and drywall.

Amoreena Clarkson, Criminalist II for the Columbus Police Crime Laboratory, routinely reviews evidence submitted to the lab for biological fluids and performs DNA analysis. She testified that she is not an expert in statistics; however, she is able to use the software program provided by the manufacturer to type the samples. The procedures used in the lab are the standard operating procedures accepted in the scientific community. Those procedures include using a database generated by the FBI that is accepted across the community and used in the normal protocol for the lab. Ms. Clarkson was able to match the DNA types from the stains on the blue jean material with the blood standard from the victim Robin Brown.

Bobbie Jo Kennedy, forensic scientist for BCI & I, testified that she had been performing DNA analysis for approximately five years. She testified that she had specialized training in DNA at BCI & I and through other workshops. Ms. Kennedy testified to the accreditation standards met at BCI & I regarding how evidence is handled, security of the building, techniques used and documentation all of which are subject to audit. The trial court found that she was an expert witness under Evid.R. 702 and relied upon the Montgomery Court of Appeals case *State v. Powell* (Dec. 15, 2000), 2nd Dist. No. 18095, in overruling the defense objection regarding testifying about statistical conclusions that utilized the FBI database.

The first report Ms. Kennedy issued included items she tested from the vaginal swabs, fingernail scrapings, a knife blade, drywall, and standards from the victim and appellant. The victim's blood was on the knife blade and was the only profile on the blade. Appellant was excluded as the source of the DNA from the vaginal swabs, the fingernail scrapings and the knife blade. However, the DNA profile from the drywall was a mixture consistent with contributions from the victim Robin Brown and appellant. Appellant could not be excluded as the minor source of the DNA from the drywall and using the national database from the FBI, the proportion of the population that cannot be excluded as possible contributors to the mixed DNA profile from the drywall was one in 10,990 individuals. Ms. Kennedy

7

also tested the cigarette butt, found in the garage. She testified that there was a mixture of DNA profiles on the cigarette butt, with appellant as consistent for the major contributor and the victim as consistent with the minor contributor.

Robin Roggenbeck, a latent print examiner and forensic scientist with BCI & I, analyzed the piece of that drywall that had been covered with blood. Ms. Roggenbeck took a digital image of the surface as it was and then used an enhydrant to further enhance the image and preserve the print. The digital image was stored in the computer. Ms. Roggenbeck was able to identify one sufficient latent palm print area, the interdigital area of the left palm. The latent print was then compared by Ms. Roggenbeck to known prints from appellant and Robin Brown. There were more than ten points that she was able to identify in the print as well as the proper ridge flow and the clarity and quantity of the point resulting in a positive identification. Furthermore, Ms. Roggenbeck was able to determine that appellant's hand was in the victim's blood to make the print, meaning the print was not on the wall prior to the blood splatter. The defense expert Michael Sinke corroborated Ms. Roggenbeck's conclusion.

On March 11, 2005, appellant was indicted by the Grand Jury of Fairfield County, Ohio, for one count of Aggravated Murder, in violation of R.C.2903.01(B) with two Death Penalty Specifications, in violation of R.C.2929.04(A)(3) and R.C. 2929.04(A)(7); one count of Aggravated Murder, in violation of R.C. 2903.01(A), with two Death Penalty Specifications, in violation of R .C. 2929.04(A)(3) and R.C. 2929.04(A)(7); one count of Murder, in violation of R.C. 2903.02(B); two counts of Kidnapping, in violation of R.C. 2905.01(B) and R.C.2905.01(A)(4); two counts of Aggravated Robbery, in violation of R.C. 2911.01(A)(1) and R.C. 2911.01(A)(3); one count of Aggravated Burglary, in violation of R.C. 2911.11(A)(2); and one count of Rape, in violation of R.C.2907.02(A)(2).

A verdict of guilty was returned by the jury as to Count One, Aggravated Murder, in violation of R.C. 2903.01(B); Count Two, Aggravated Murder, in violation of R.C. 2903.01(A); Count Three, Murder, in violation of R.C. 2903.02(B); Count Four, Kidnapping, in violation of R.C. 2905.01(A)(4); Count Six, Aggravated Robbery, in violation of R.C. 2911.01(A)(1); and Count Seven, Aggravated Robbery, in violation of R.C. 2911.01(A)(3). Further, the jury found the appellant not guilty as to Counts Five, Kidnapping, and Count Eight, Aggravated Burglary, and the two Specifications to Counts

8

One and Two.

On July 5, 2006, the appellant's sentencing hearing was held. The Court found that Count One, Aggravated Murder, Count Two, Aggravated Murder, and Count Three, Murder merged for purposes of sentencing. The State of Ohio elected to have the appellant sentenced on Count Two, Aggravated Murder, in violation of Ohio Revised Code R.C. 2903.01(A). Pursuant to Ohio Revised Code R.C. 2929.03(C)(1)(a) the Court sentences appellant to life imprisonment with parole eligibility after 20 years. With respect to Count Four Kidnapping, in violation of R.C. 2905.01(B), the Court sentenced appellant to 10 years in the Correctional Reception Center. The trial court merged Counts Six and Seven, Aggravated Robbery, in violation of R.C. 2911.01(A)(3) and R.C. 2911.01(A)(1). The Court sentenced appellant to 10 years in the Correctional Reception Center on the merged counts.

The Court ordered that the sentences imposed on Count Four and merged Counts Six and Seven be served concurrently to each other, but consecutively to the sentence imposed on Count Two. The Court further ordered that appellant pay the costs of prosecution. Thus, appellant's aggregate sentence is a life sentence with parole eligibility after 20 years to be served consecutively to a 10-year prison sentence.

*State v Bruce*, No. 2006-CA-45, 2008 WL 4801648, at *1-7 (Ohio App. 5th Dist. Oct 31, 2008).

Petitioner filed a timely appeal, raising the following three assignments of error:

I. *CRAWFORD* BARS TESTIMONIAL STATEMENTS OF A NON-TESTIFYING WITNESS, UNLESS THE WITNESS IS UNAVAILABLE AND THE ACCUSED HAD AN OPPORTUNITY FOR CROSS-EXAMINATION. ALTHOUGH FBI PERSONNEL GENERATED THE STATISTICAL DNA EVIDENCE, NO FBI STATISTICAL EXPERT TESTIFIED; RATHER, THE STATE PRESENTED THE FBI'S EVIDENCE THROUGH THE *BIOLOGICAL* DNA ANALYSTS, WHO DID NOT PERSONALLY KNOW HOW THE FBI GENERATED THE EVIDENCE. OVERRULING MR. BRUCE'S *CRAWFORD* OBJECTION VIOLATED HIS RIGHTS UNDER THE OHIO AND UNITED STATES CONSTITUTIONS TO CONFRONT THIS POWERFUL EVIDENCE.

II. BY ALLOWING THE STATE TO PRESENT THE FBI'S

STATISTICAL DNA EVIDENCE THROUGH ITS BIOLOGICAL EXPERTS, WHERE THE ABSENCE OF A QUALIFIED EXPERT DEPRIVED THE DEFENSE OF THE OPPORTUNITY TO TEST THE RELIABILITY OF THE SCIENTIFIC BASIS FOR THE TESTIMONY THROUGH CROSS-EXAMINATION, THE TRIAL COURT VIOLATED MR. BRUCE'S RIGHTS UNDER EVID.R. 702 AND UNDER THE CONFRONTATION AND DUE PROCESS CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS.

III. THE TRIAL COURT ERRED BY SENTENCING MR. BRUCE TO MAXIMUM SENTENCES FOR KIDNAPPING AND AGGRAVATED ROBBERY COUNTS AND ORDERING THEM TO BE SERVED CONSECUTIVELY TO THE AGGRAVATED MURDER COUNT, BECAUSE SENTENCING UNDER *STATE V. FOSTER*, 109 Ohio St.3d 1, 2006-OHIO-856, 845 N.E.2d 470, RETROACTIVELY SUBJECTS A DEFENDANT TO A "STATUTORY MAXIMUM SENTENCE" THAT GREATLY EXCEEDS THE MAXIMUM SENTENCE THE DEFENDANT WAS SUBJECT TO WHEN THE ALLEGED OFFENSES WERE COMMITTED. THIS VIOLATES THE DUE PROCESS CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS.

*State v. Bruce*, 2008 WL 4801648, at *7. On October 31, 2008, the appellate court affirmed the trial court's judgment. *Id.* On March 25, 2009, the Ohio Supreme Court dismissed Petitioner's appeal. *State v. Bruce,* 121 Ohio St.3d 1427 (2009). On October 5, 2009, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari*. *Bruce v. Ohio*, 130 S.Ct. 188 (2009).

On October 1, 2010, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raises the following sole ground for relief:

The admission of statistical DNA evidence generated by the FBI's popstat program but presented by biological DNA analysts, who were not qualified as statistical exerts and did not personally know how the FBI generated the statistical evidence, violated Petitioner's rights under the Confrontation Clause of the United States Constitution.

10

It is the position of the Respondent that Petitioner's claim is without merit.

## MERITS

As his sole ground for federal habeas corpus relief, Petitioner asserts that his convictions violate the Confrontation Clause, because Amoreena Clarkson and Bobbie Joe Kennedy, DNA analysts, testified regarding the statistical probability that it was Petitioner's DNA on bloody drywall and cigarette butt found near the scene of the crime as indicated by "Popstat", the FBI's DNA software database program, which indicates the expected frequency of occurrence of DNA profiles obtained by police.  Petitioner complains that neither Clarkson nor Kennedy had expertise in probability or statistics,  knowledge of how the FBI's program arrived at its statistical conclusions, the reliability of its statistics, or the nature and characteristics of the FBI database.

The state appellate court rejected this claim as follows:

> [A]ppellant maintains that the statistical DNA evidence the State presented in an effort to identify him as a accomplice in the killing is "testimonial" under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. We disagree.
>
> In *State v. Pierce*[FN1] (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, the Ohio Supreme Court held that "DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible." In *Pierce,* the Court recognized that "the theory and procedures used in DNA typing are generally accepted within the scientific community." 64 Ohio St.3d at 497, 597 N.E.2d 107. Further, the Court held that "questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. No pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence. The trier of fact * * * can determine whether DNA evidence is reliable." *Pierce,* 64 Ohio St.3d at 501, 597 N.E.2d 107. Accord *State v. Nicholas* (1993), 66 Ohio St.3d 431, 437, 613 N.E.2d 225 ("DNA results constitute reliable evidence"). See also, *State v. Adams,* 103

11

Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29 at ¶ 80. (DNA evidence meets Evid. R. 702's reliability requirement).

FN1. Superseded by Rule on other grounds as stated in *State v. Nemeth,* 82 Ohio St.3d 202, 1998 Ohio 376, 694 N.E.2d 1332.

An appellate court should apply an abuse of discretion standard in reviewing a court's decision to admit or exclude expert testimony. *Gen. Elec. Co. v. Joiner* (1997), 522 U.S. 136, 144-146, 118 S.Ct. 512, 139 L.Ed.2d 508; *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 446 N.E.2d 444. "To the extent that doing so is necessary to avoid making an unreasonable, arbitrary, or unconscionable decision, a trial court is obliged to apprise itself of the details of proffered evidence." *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683 at ¶ 20.

In the case at bar, appellant argues that the FBI database used to calculate the statistical conclusion based upon the input gathered from BCI & I is testimonial. A brief synopsis of the process to test appellant's DNA and the DNA recovered from the victim and/or crime scene is necessary.

As one court explained the biological analysis, "involves determining the specific genetic variations, or 'alleles,' in the DNA samples at specific sites ('loci') along the DNA thread. The particular variations examined in this case are called short tandem repeats, or 'STRs.' They were examined at thirteen loci which have been adopted as a national standard for use in the Combined DNA Identification System (CODIS) established by Congress in 1994. The PCR-based analysis using the thirteen STR loci has been explained by the Supreme Court of New Hampshire as follows:

" 'At each locus, an individual's genetic code contains a combination of chemical markers organized into a pattern. These chemical patterns repeat themselves and these repeats can be chemically cut apart from one another. At any particular chromosomal locus, an individual will have a characteristic inherited from each of his or her parents, known as an allele. Further, at any given locus, a person will have DNA with a specific number of repeats of these alleles from each parent. Thus, for example, a person's PCR-based STR DNA

profile for a particular DNA locus could contain a ten-repeat allele from his or her mother and a twelve-repeat allele from his or her father. STR testing involves the examination of short repeats and distinguishes between individuals by comparing the number of repeats at certain loci.'" *Roberts v. United States* (D.C.Cir.2007), 916 A.2d 922, 926-927). (Quoting *State v. Whittey* (2003), 149 N.H. 463, 821 A.2d 1086, 1093.

"The relevance of the DNA analysis, in criminal law generally, and in the context of this case, is to establish the identity of the source of a DNA sample discovered at a crime scene. If the DNA sample from the crime scene matches the DNA of an accused, it is at least evidence that the DNA discovered at the crime scene is that of the accused. If the DNA sample matches the DNA of the accused *and no one else,* then it, of course, conclusively establishes that the accused is the source of the DNA found at the scene of the crime. This distinction is expressed in terms of statistical probability of the match occurring randomly in the population. A DNA expert might testify that a given DNA match will occur only once in a population of 10,000,000. Obviously, such a probability makes it highly likely that the DNA samples came from the same source. If the DNA expert's testimony, however, is that a given match might occur coincidentally once in every one hundred samples, then it is far weaker in establishing the sources of the DNA samples as being one and the same individual.

"Thus, in terms of the inferential conclusion to be drawn from DNA evidence in a criminal trial – the accused as source of the DNA sample found at the crime scene – DNA analysis generally can provide only statistical probability; e.g., there is one chance in four hundred or one chance in four million that the DNA sample came from someone else. Conversely, a DNA *mismatch* constitutes conclusive and certain scientific proof that the DNA samples come from different sources. For proving identity, however, as opposed to disproving identity, DNA can never provide absolute, conclusive proof, even though extremely low probabilities of a coincidental match provide a basis for very strong inferences of identity." *Commonwealth v. Crews* (1994), 536 Pa. 508, 519, 640 A.2d 395, 400.

In the case at bar, appellant is not challenging the "matching" portion of the DNA analysis; appellant is only challenging the *statistical*

portion of the DNA test evidence.

In this case, the experts relied upon a database compiled by the Federal Bureau of Investigation through its "Popstat" computer software program. Appellant claims that he was denied any opportunity to cross-examine the FBI's random match probability estimates because the witnesses presented at appellant's trial did not prepare the database and had no personal knowledge of the methods and procedures the FBI used to compute the statistical estimates or the database upon which the calculations were based. [Appellant's Brief at 14].

In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court held that testimonial statements of a witness who does not appear at trial may not be admitted or used against a criminal defendant unless the declarant is unavailable to testify, and the defendant has had a prior opportunity for cross-examination. *Crawford* thus involved the admissibility under the Confrontation Clause of recorded testimonial statements of a person who did not testify at the trial. The holding in *Crawford* was that such statements, regardless of their reliability, are not admissible unless the defendant was able to cross-examine their maker.

The Ohio Supreme Court recently addressed *Crawford* in examining whether the admission of DNA reports without the testimony of the analyst who prepared the report violated the Confrontation Clause. *State v. Crager,* 116 Ohio St.3d 369, 879 N.E.2d 745, 2007-Ohio-6840. The Court found the key inquiry under *Crawford* was whether a particular statement was testimonial or non-testimonial. *Id.* at ¶ 41. It then determined that the reports of DNA analysis prepared by an analyst at BCI were business records that fell under the hearsay exception of Evid.R. 803(6) and therefore, were not testimonial under *Crawford.*

In *Crawford* the Supreme Court stated that business records, which are analogous to public records are "by their nature * * *not testimonial" and not subject to the requirements of the Confrontation Clause. *Id.* at 56; "[t]o its credit, the Court's analysis of 'testimony' excludes at least some hearsay exceptions, such as business records and official records. See *ante,* at 1367. To hold otherwise would require numerous additional witnesses without any apparent gain in the truth-seeking process." *Id.* at 76, 124 S.Ct. at 1378. (Rehnquist, C.J., concurring).

14

DNA samples have been held to be non-testimonial evidence with respect to the Fifth Amendment privilege against self-incrimination. A DNA sample obtained from a state prisoner, pursuant to Ohio statute requiring the collection of DNA specimens from convicted felons, was physical, rather than testimonial evidence, and thus did not implicate the prisoner's Fifth Amendment privilege against self-incrimination. *Wilson v. Collins* (C.A.6, 2008), 517 F.3d 421, 431. The Court reasoned that a DNA sample was analogous to a photograph or fingerprint identifying an individual. *Id.* (Citing *United States v. Zimmerman,* 514 F.3d 851, 853 (9th Cir.2007)(citing *Schmerber v. California,* 384 U.S. 757, 765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that "blood test evidence, although an incriminating product of compulsion, [is] neither [ ] testimony nor evidence relating to some communicative act or writing" and is therefore not protected by the Fifth Amendment)).

The Court's decision in *Crawford* neither overruled nor called into question its two earlier decisions that addressed and resolved a similar issue: *Delaware v. Fensterer* (1985), 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 and *United States v. Owens* (1988), 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951.

Owens involved an adult victim of a severe beating, who suffered memory loss stemming from his head injuries and testified at trial. While hospitalized, he had identified Owens as his assailant, which identification was admitted into evidence. During the victim's cross-examination, he was unable to recall details of the attack and the identification.  *Id.* at 556, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951. The Ninth Circuit held that, under the circumstances, the introduction of the victim's testimony violated the Confrontation Clause. The Supreme Court reversed, ruling, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *Id.* at 559, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (quoting *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) and *Delaware v. Fensterer,* 474 U.S. 15, 19-20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)) (emphasis in original). In *Fensterer,* the Court held that the Confrontation Clause was not violated where an expert witness who testified as to his opinion could not recollect the basis upon which he had formed that opinion. In *Fensterer,* the Court

15

explained that:

"The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the fact finder the reasons for giving scant weight to the witness' testimony." 474 U.S. at 21-22, 106 S.Ct. 292, 88 L.Ed.2d 15.

It is true that in *Owens* the witness at least recalled having identified the defendant. 484 U.S. at 556, 108 S.Ct. at 840. However, the Court did not restrict its reasoning to such situations. Instead, the Court "agree[d] with the answer suggested" in "Justice Harlan's scholarly concurrence" in *California v. Green* (1970), 399 U.S. 149, 188, 90 S.Ct. 1930, 1950, 26 L.Ed.2d 489 that "a witness' inability to 'recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence.'" 484 U.S. at 558, 108 S.Ct. at 841. The accused has been "confronted with the witnesses against him," as the Sixth Amendment demands, so long as the prosecution produces the witnesses and the witnesses answer defense questions. "[S]uccessful cross-examination is not the constitutional guarantee." 484 U.S. at 560, 108 S.Ct. at 843. When a witness has forgotten the basis for and the giving of testimony under oath in an earlier proceeding and that testimony is then introduced into evidence, defense questioning, though impaired, is not futile for the reasons given in *Owens*. It is still possible to bring out on cross-examination the "witness' bias, his lack of care and attentiveness ... and even (what is often a prime objective of cross-examination) the very fact that he has a bad memory." *Id.* at 559, 108 S.Ct. at 842 (citation omitted). *United States v. Milton* (D.C.Cir., 1993), 8 F.3d 39, 47.

The experts in the case at bar did not perform the statistical calculation; rather the computer perform this task. Appellant can, and did, attack the witnesses' lack of knowledge not unlike the situation presented in *Fensterer,* supra. Appellant did not proffer or present anything of evidentiary quality to challenge the reliability of the FBI database or the method of arriving at the statistical conclusion. See, e.g. *State v. Isley* (1997), 262 Kan. 281, 936 P.2d 275; *Watts v. State*

16

(Miss.1999), 733 So.2d 214 at ¶ 28-31.

In *State v. Adams,* the Ohio Supreme Court observed:

"To support his claims, Adams cites a variety of studies suggesting limitations on DNA evidence. For example, Adams argues that the court should have excluded DNA evidence because of controversy over (1) 'the statistical estimates being offered for Polymerase Chain Reaction (PCR) tests'; (2) 'the reliability of the methods used * * * for collecting, handling, processing, and testing crime scene samples'; and (3) 'coincidental match probabilities and false error rates.'

"However, the issues that Adams now raises 'go to the weight of the evidence rather than its admissibility.' *Pierce,* 64 Ohio St.3d 490, 597 N.E.2d 107, paragraph two of the syllabus ..." 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29 at ¶ 81-82.

Our review of the record reveals that Ms. Kennedy was sufficiently familiar with the underlying formula used by the computer program to generate statistical conclusions. (24T. at 5048-5049; 5096-5097). Appellant's attorney was acutely aware of the mathematics used by the computer program. (24T. at 5161-5162; 5163). The experts testified that they used the FBI database as part of their standard operating procedure. BCI & I is accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board, ASCLD/LAB for forensic DNA and DNA laboratories. (20T. at 4321). The accreditation includes both training and audits to make sure the lab is upholding all of the requirements and standards to properly determine whose DNA is present on the items tested. ( *Id.*). Ms. Clarkson testified that she has a master's degree in forensic DNA and serology. She further has attended numerous workshops, training courses and a DNA statistic workshop. (21T. at 4494-4495). She further has passed the FBI required two proficiency tests per year. (21T. at 4496). Ms. Clarkson has testified more than twenty (20) times. In addition, she has been qualified as an expert on DNA analysis on previous occasions. ( *Id* . at 4497, 817 N.E.2d 29).

Ms. Kennedy testified that she began doing DNA analysis in graduate school. (24T. at 5034). She has received specialized training and attended specialized training programs in statistics. (24T. at 5035). She has been qualified as an expert and has testified on five previous

occasions. ( *Id.* at 5038, 817 N.E.2d 29).

We find Ms. Clarkson and Ms. Kennedy to be properly qualified. See, *Crager,* 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745 at ¶ 12.

We further note that there was no question in the *Crager* case that the DNA expert was able to testify to the statistical conclusions generated in his report. *Crager* at ¶ 23. The DNA expert in the *Crager* case testified that the frequency of occurrence of appellant's DNA profile was 1 in 1.028 quintillion people. *Id.* There was no question from the DNA expert concerning the database that was used to generate that number. *Id.*

Appellant argues that the Ohio Supreme Court incorrectly decided *Crager.* However, this Court cannot declare a decision by a superior court to be unconstitutional. Article IV of the Ohio Constitution designates a system of "superior" and "inferior" courts, each possessing a distinct function. The Constitution does not grant to a court of appeals jurisdiction to reverse or vacate a decision made by a superior court. See, *State, ex rel. Potain v. Mathews* (1979), 59 Ohio St.3d 29, 32, 391 N.E.2d 343, 345; OH. Const. art. IV, sec. 5; R.C. 2501.02. An inferior court has no jurisdictional basis to review the actions and decisions of superior courts.

We find the statistical DNA evidence the State presented in an effort to identify appellant as a accomplice in the killing is not "testimonial" under *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

Accordingly, appellant's first assignment of error is denied.

*State v. Bruce*, 2008 WL 4801648, at *8-13.

The factual findings of the state appellate court are presumed to be correct.  28 U.S.C. §

2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas

18

> corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. at 694.  To obtain habeas corpus relief, Petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Bobby v. Dixon*, – S.Ct. –, 2011 WL 5299458, at *1 (Nov. 7, 2011)(quoting *Harrington v. Richter,* 562 U.S. ——, ——, 131 S.Ct. 770, 786–87 (2011).  This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error

19

correction through appeal." *Harrington v.Richter*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross examine adverse witnesses at all stages of the trial.  *Illinois v. Allen,* 397 U.S. 337, 388 (1970). In *Crawford v. Washington,* 541 U.S. 36 (2004), the United States Supreme Court abrogated its holding in *Ohio v. Roberts,* 448 U.S. 56 (1980), and re-defined the test for determining whether admission of hearsay statements violates the Confrontation Clause. The Supreme Court in *Crawford* held that testimonial statements of a witness who does not appear at trial are inadmissible unless the witness was unavailable to testify and the defense had a prior opportunity to cross examine the witness.  Under *Crawford*, "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination." *Id.* at 1366. The Supreme Court, however, left untouched application of *Roberts* to cases involving nontestimonial hearsay:

> ["Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts,* and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. As the courts applying *Crawford* have observed,
>
>> [t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements....

20

> [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*Coy v. Renico,* 414 F.Supp.2d 744, 773 (E.D. Mich.2006) (quoting *United States v. Hendricks,* 395 F.3d 173, 179 (3d Cir. 2005)); *Horton v. Allen,* 370 F.3d 75, 83-84 (1st Cir. 2004). The Supreme Court declined to define a comprehensive definition of the term "testimonial," but indicated, at a minimum, the term includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford,* 541 U.S. at 68. A casual remark to an acquaintance, business records, and statements made in furtherance of a conspiracy do not constitute testimonial statements within the protection of the Sixth Amendment. *Id.* at 51-55. In the Sixth Circuit, the test for determining whether a statement is deemed testimonial within the meaning of *Crawford* is:

> . . . whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

Further, "admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. . . . [T]he statement must be used as hearsay-in other words, it must be offered for the truth of the matter asserted." *United States v. Pugh,* 405 F.3d 390, 399 (6th Cir. 2005).Moreover, while the Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses against him, this right is not unlimited. "Trial judges retain wide latitude. . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive

or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).  The Confrontation Clause thus guarantees the opportunity for effective cross-examination – not cross-examination in whatever way or to whatever extent the defendant may desire. *Id.* (quoting *Delaware v Fensterer*, 474 U.S. 15, 20 (1985); *see also Norris v. Schotten*, 146 F3d 314, 330 (6th Cir. 1998)(no Confrontation Clause violation where relevance of questions prohibited on cross-examination is unclear and risk of prejudice real)(citations omitted).

> [A]n accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff,* 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)( *quoting Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)).

*Dell v. Straub,* 194 F.Supp.2d 629, 644 (E.D. Mich. 2002).  Finally, a violation of the Confrontation Clause is subject to harmless error review.  *United States v. Pugh,* 405 F.3d at 400(citing *Jordan v. Hurley,* 397 F.3d 360, 363 (6th Cir. 2005)).

In support of his claim that testimony from DNA experts regarding the statistical probability that it was Petitioner's DNA found on evidence in this case, Petitioner cites *Melendez-Diaz,* – U.S. –, 129 S.Ct. 2527 (2009), which held that admission of affidavits indicating the results of forensic analysis establishing that material seized by police and connected to the defendant constituted cocaine, without testimony of the person who obtained those results, constituted testimonial evidence within the meaning of *Crawford*, violating the defendant's right to cross-examine witnesses under the Sixth Amendment.  In so holding, the Supreme Court stated:

> [T]he Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands,

> not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." 541 U.S., at 61–62, 124 S.Ct. 1354.
>
> Respondent and the dissent may be right that there are other ways—and in some cases better ways—to challenge or verify the results of a forensic test.[FN5] But the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available.
>
> FN5. Though surely not always. Some forensic analyses, such as autopsies and breathalyzer tests, cannot be repeated, and the specimens used for other analyses have often been lost or degraded.

*Id*. at 2536.  In this same respect, Petitioner argues he was denied the right to challenge the reliability of the Popstat statistical evidence where such evidence was admitted though forensic scientists with neither expertise in statistics nor personal knowledge as to how the probabilities incriminating Petitioner were obtained.  *See Traverse*, PageID #499-500.

Petitioner also refers to *Bullcoming v. New Mexico*, – U.S. –, 131 S.Ct. 2705 (2011), in support of this claim.  In *Bullcoming,* the United States Supreme Court similarly held that a blood alcohol breath test report indicating the defendant's blood alcohol content in a prosecution for driving while under the influence of alcohol or drugs constituted a testimonial statement within the Sixth Amendment, and the defendant had a right to cross-examine the analyst who conducted the breath test, absent unavailability of the witness and a prior opportunity for cross-examination.  In *Bullcoming,* the prosecution failed to present the witness who had conducted the blood-alcohol test, instead introducing the evidence through another analyst who had no involvement in the specific test but qualified as an expert in the blood alcohol testing machine.  *Id*. at 2713.  In overturning

Bullcoming's conviction, the Supreme Court stated:

> [T]he comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar. This Court settled in *Crawford* that the "obviou[s] reliab[ility]" of a testimonial statement does not dispense with the Confrontation Clause. 541 U.S., at 62, 124 S.Ct. 1354; see *id.,* at 61, 124 S.Ct. 1354 (Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing [the evidence] in the crucible of cross-examination"). Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess "the scientific acumen of Mme. Curie and the veracity of Mother Teresa." *Melendez–Diaz,* 557 U.S., at ——, n. 6, 129 S.Ct., at 2537, n. 6.

*Id*. at 2715.

Here, the state appellate court relied, *inter alia*, on the Ohio Supreme Court's decision in *Crager* to conclude that testimony from the prosecution's DNA experts did not violate the Confrontation Clause by relying on statistics generated by the FBI's Popstat program when testifying regarding the probability that it was Petitioner's DNA on the bloody wall and cigarette, even though no experts on the Popstat program itself, testified. On September 17, 2009, and prior to the date that Petitioner's judgment of conviction became final, however, the Ohio Supreme Court vacated Crager's conviction and remanded the case to the trial court for a new trial consistent with *Melendez-Diaz. State v. Crager*, 123 Ohio St.3d 210 (2009).

More recently, on June 18, 2012, in *Williams v. Illinois*, – U.S. –, 132 S.Ct. 2221 (2012), in a five to four decision, the Supreme Court concluded that a testifying expert may assume the truth of an out-of-court statement consisting of a DNA profile produced by an outside laboratory without violating the Confrontation Clause. *Goins v. Smith*, 2012 WL 3023306, at *6 (N.D. Ohio July 24, 2012)(citing *Williams*). The facts in *Williams* indicate that the prosecution presented a DNA expert

24

to testify a DNA profile produced by an outside laboratory and obtained from semen taken from vaginal swabs of the victim matched a DNA profile produced by the state police laboratory using a sample of Petitioner's blood. *Williams*, 132 S.Ct. at 2227.  In reaching this decision, the Supreme Court reasoned that the State's expert's testimony regarding the laboratory results produced by an outside agency were not offered for the truth, but solely to explain the assumptions on which the expert based her opinion, and thus fell outside the scope of the Confrontation Clause. *Id.* at 2228.

The Supreme Court stated:

> As a second, independent basis for our decision, we also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See *Perry v. New Hampshire,* 565 U.S. ——, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

*Id.*

25

The parties have not addressed the impact of the Supreme Court's holding in *Williams*, however, and it appears unlikely that *Williams,* decided long after Petitioner's judgment of conviction became final, is to be retroactively applied on collateral review:

> No federal appellate court has yet addressed whether *Bullcoming* or *Williams* established a "watershed" rule of criminal procedure, see *Vega v. Walsh,* 669 F.3d 123, 127 (2d Cir.2012) (expressly not deciding "whether the rulings of *MelendezDiaz* or *Bullcoming* apply retroactively"), but district courts have found that it does not. See *Benjamin v. Harrington*, 2012 WL 3248256, at *7 & n. 3 (C.D.Cal. June 27, 2012) (noting that *Bullcoming* and *Williams* did not create new rules, but are simply applications of the *Melendez–Diaz* and *Crawford* holdings to new sets of facts); *McMonagle v. Meyer,* No. CIV S–11–2115 GGH P., 2012 WL 273165, at *5 (E.D.Cal. Jan.30, 2012) ("[T]he Supreme Court's decision in *Bullcoming* was not made retroactively applicable to cases on collateral review."). Indeed, it is difficult to imagine how it could. As another court recently explained:
>
> > *Bullcoming* and *Melendez–Diaz* represent even less of a watershed moment in criminal procedure than did Crawford. Where *Crawford* completely redefined the confrontation clause's requirements, *Melendez–Diaz* further explored the characteristics of testimonial statements under *Crawford* and, in turn, *Bullcoming* expanded upon *Crawford* 's and *Melendez–Diaz* 's rationales. *Bullcoming,* 131 S.Ct. at 2713–14, 2716- 17; *Melendez–Diaz,* 129 S.Ct. at 2532.... Thus, the [ ] court's rationales barring retroactive application of *Crawford* on collateral review apply with greater force to *Crawford* 's progeny, *Bullcoming* and *Melendez–Diaz.*
>
> *In re Hacheney,* 166 Wash.App. 322, 269 P.3d 397, 404 (Wash.App. Div. 2 2012).

*Gilchrist v. United States,* Nos. DKC 08-1218, DKC 02-0245, 2012 WL 4520469, at *11 (D.Md.

Sept. 27, 2012).[1]

Further, the United States Supreme Court sharply divided over the reasoning in *Williams*, "leaving 'significant confusion in their wake.'" *United States v. Garvey*, 688 F.3d 881 (7th Cir. 2012), (quoting *Williams*, 132 S.Ct. at 2265 (Kagan, J., dissenting); *see also id.* at 2265 (Kagan, J., dissenting)(noting that "Five Justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication").

This Court need not determine the issue, however, as the record reflects any error in admission of statistical evidence regarding DNA evidence was harmless. "An error is not harmless if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Jordan v. Warden, Lebanon Correctional Inst.*, 675 F.3d 586, 598 (6th Cir. 2012)(quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (internal quotation marks omitted)). Such were not the circumstances here. Even without admission of the statistical evidence complained of, there was substantial evidence of Petitioner's guilt. Petitioner's handprint was found in the victims's blood on the inside wall of the house where she was killed, and that handprint had been made after, and not before, the blood was on the wall. *Trial Transcript*, at 4123, 5300-5301. His DNA as well as the victim's was obtained from a cigarette butt found near the scene of the crime. *Id.* at 5065. Petitioner told police he had been in the house due to his job, but the prosecution offered evidence that this statement was false. *Id.* at 4191, 4196, 4220, 4714. Although Brucer told police he left town prior to the date of the murder, this explanation, too, proved to be false. Records of the van

---

[1] "*Crawford* is not applicable on collateral review or retroactively." *Chinn v. Warden, Mansfield Correctional Inst.*, No. 3:02-cv-512, 2011 WL 5338973, at *54 (S.D. Ohio Oct. 14, 2011)(citing *Whorton v. Bockting,* 549 U.S. 406 (2007); *Dorchy v. Jones,* 398 F.3d 783 (6th Cir.2005).

that picked him up the night his car broke down showed that he left town on the night of the murder. *Id.* at 4259-4262, 4761, 4799-4804. Bloody denim matching the bindings that had been used to tie the victim were found inside Petitioner's van. *Id.* at 4279. The victim's blood was on the denim. *Id.* at 4413-21. Moreover, Petitioner's attorney was able to cross examine the prosecution's experts on their lack of knowledge regarding the FBI's Popstat program or how the statistical evidence was obtained.

For all the foregoing reasons, the Magistrate Judge cannot conclude that testimony by the State's DNA experts regarding the statistical probability that Petitioner's DNA was located on bloody drywall and the cigarette butt found near the scene of the crime had a substantial and injurious effect on the jury's finding of guilt.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**PROCEDURE ON OBJECTIONS**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation*

28

will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

s/Mark R. Abel
United States Magistrate Judge

29